UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
New Haven Division

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
|     NELSON R. ROUETTE and | : | |
|     SANDRA CALVO-ROUETTE, | : | |
|           *Debtors* | : | Case No. 13-20250 (AMN) |
| | : | |
| HYUNDAI-WIA MACHINE AMERICA | : | Adv. Pro. No. 13-02018 (AMN) |
| CORP. | : | |
|           *Plaintiff* | : | |
| v. | : | |
| NELSON R. ROUETTE and, | : | |
| SANDRA CALVO-ROUETTE, | : | |
|           *Defendants* | : | |

## RULING AND MEMORANDUM OF DECISION

Plaintiff Hyundai-Wia Machine America Corporation ("Hyundai") commenced this adversary proceeding to hold the joint debtors Nelson Rouette ("Rouette") and Sandra Calvo-Rouette ("Calvo-Rouette") (together, defendants, or the "Rouettes") individually liable for an obligation of their corporation, Quality Machine Solutions, Inc. ("QMSI"), that arose from a $1,650,000.00 consent judgment entered in the District of New Jersey[1] against QMSI. If successful in piercing the corporate veil and imposing individual liability against the defendants, Hyundai further seeks a judgment determining that the debt is nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and/or (a)(6).

For the reasons that follow, the court concludes that Hyundai failed to satisfy its burden to establish a justification for piercing QMSI's corporate veil and failed to establish that the defendants are liable for the Consent Judgment against QMSI. Consequently,

---

[1] Hyundai-Kia Machine America Corp. v. Quality Machine Solutions, Inc., Case No. 2:08-cv-02838-JLL-CCC (D.N.J. 2009). The parties stipulated that Hyundai-Kia Machine America Corp. and the plaintiff here are the same corporation. *See also,* AP-ECF No. 1, ¶7.

Hyundai's proof of claim number 5-1 ("POC 5-1") must be disallowed pursuant to 11 U.S.C. § 502(b)(1), and there is no debt that may be determined nondischargeable under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), or (a)(6).[2]

## I.     Jurisdiction, Standing and Venue

The United States District Court for the District of Connecticut (the "District Court"), has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b).  The Bankruptcy Court derives its authority to hear and determine this matter pursuant to 28 U.S.C. § 157(a) and the Order of Reference of the District Court dated September 21, 1984.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), and (I).  This Court has the statutory authority and jurisdiction over core proceedings pursuant to 28 U.S.C. §§ 157(b)(1) and 1334 to hear and enter a final order in this matter subject to traditional appeal rights.  This memorandum opinion shall serve as the Court's findings of facts and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

The defendants previously moved to dismiss the case on the grounds that *Stern v. Marshall*, 564 U.S. 462 (2011), barred the bankruptcy court from determining the non-core, Connecticut state-law veil-piercing claim in a dischargeability proceeding. *See*, AP-ECF No. 37.[3]  Denying their motion to dismiss, the Honorable Albert S. Dabrowski, United States Bankruptcy Judge (Retired), found that the bankruptcy court had the authority to

---

[2] The present case is distinguishable from the Supreme Court's recent decision in *Husky Electronics Int'l v. Ritz*, 572 U.S. ___,136 S. Ct. 1581, 1586 (2016), in that Hyundai has not established its claim against the Rouettes under a veil-piercing theory of liability, so the court does not reach the question of whether the Rouettes engaged in a scheme to defraud Hyundai under 11 U.S.C. § 523(a)(2)(A).

[3] References to the docket of the underlying chapter 7 case, Case No. 13-20250 (AMN), appear in the following format: "ECF. No. ———." References to the docket of this adversary proceeding, A.P. Case No. 13-02018 (AMN), appear in the following format: "AP-ECF No. ———."

enter a final decision on the veil-piercing issue.  *Hyundai-Wai v. Rouette* (*In re Rouette*), 500 B.R. 670, 678 (Bankr.D.Conn. 2013).[4]

Hyundai's veil-piercing claim is a core-proceeding. Hyundai seeks to establish the defendants' personal liability for a debt owed to it by the defendants' corporation through the veil-piercing claim.  Although veil-piercing theories of liability are creatures of state-law, it does not follow that determination of such issues is non-core; "[a] determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by state law." 28 U.S.C. § 157(b)(3).  Here, Hyundai filed a proof of claim in the main bankruptcy case, (Case No. 13-20250, POC 5-1), the validity of which the defendants dispute in this adversary proceeding.  Determining the validity and amount of such disputed claims is an essential part of the claims allowance process, and is thus a core proceeding under 28 U.S.C. § 157(b)(2)(B).  "Because '[n]othing is more directly at the core of bankruptcy administration . . . than the quantification of all liabilities of the debtor,' the bankruptcy court's determination whether to allow or disallow a claim is a core function."  *S.G. Phillips Constructors v. City of Burlington* (*In re S.G. Phillips Constructors, Inc.*), 45 F.3d 702, 705 (2d Cir. 1995) (*quoting Berton Group, Inc. v. BKW Sys., Inc.* (*In re BKW Sys., Inc.*), 66 B.R. 546, 548 (Bankr. D. N.H. 1986)); *see also, Chen v. Huang* (*In re Wen Jing Huang*), 509 B.R. 742, 754 (Bankr. D. Mass. 2014) (determining debtor's liability under state-law veil-piercing theory in dischargeability proceeding is within core jurisdiction of bankruptcy court as question of dischargeability

---

[4] Prior to trial, there was some uncertainty regarding the spelling of Hyundai's name.  *See, In re Rouette*, 500 B.R. at 679, n.1.  Both the adversary cover sheet and the complaint identify the Plaintiff as Hyundai-Wai. AP-ECF No. 1.  At trial, the parties stipulated that the proper spelling is Hyundai-Wia and that Hyundai-Wia Machine America Corp is the same company as Hyundai-Kia Machine America Corp., the party to whom the District Court of New Jersey awarded the Consent Judgment.  *See* Oct. 28, 2014 *Trial Tr.* at 54:9-55:11, AP-ECF No. 101.

under § 523(a) necessarily requires determining the scope of debtor's liability on a claim and existence of creditor's right to payment); *3N Int'l, Inc. v. Carrano* (*In re Carrano*), 530 B.R. 540, 547 (Bankr.D.Conn. 2015) (finding the issues of liability and dischargeability so intertwined that their separation in the context of §§ 523(a)(2), (4), and (6) is not feasible).

Whatever doubts remained regarding the bankruptcy court's jurisdiction to enter a final judgment in this adversary proceeding were extinguished following the recent Supreme Court decision in *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. __ ,135 S. Ct. 1932 (2015). In *Wellness*, the Supreme Court held that Article III permits bankruptcy courts to decide *Stern* claims by consent. During a June 23, 2015 status conference, the court invited the parties here to submit statements reevaluating their positions regarding the jurisdiction of the bankruptcy court in light of the *Wellness* decision. In response, the defendants filed a statement consenting to the entry of a final decision by the bankruptcy court. AP-ECF No. 118.

Accordingly, the court concludes that it has both the constitutional and statutory authority to enter a final judgment on all counts in this adversary proceeding. *See Deitz v. Ford (In re Deitz),* 760 F.3d 1038, 1044 (9th Cir.2014) (rejecting *Stern* 's application to dischargeability proceedings on the grounds that dischargeability is a "prototypical bankruptcy" matter); *In re Carrano*, 530 B.R. at 547; *In re Rouette*, 500 B.R. at 676; *Farooqi v. Carroll (In re Carroll*), 464 B.R. 293, 311–12 (Bankr. N.D.Tex. 2011) *aff'd sub nom. Carroll v. Farooqi,* 486 B.R. 718 (N.D. Tex. 2013).

4

## II.    Procedural Background

This adversary proceeding came before Judge Dabrowski for trial on October 28, 2014.    Judge Dabrowski retired on March 31, 2015 following the trial, but before submitting a final judgment or proposed findings of fact and conclusions of law.    The adversary proceeding was transferred to Chief United States Bankruptcy Judge Julie A. Manning on April 1, 2015, and then transferred to the undersigned on April 20, 2015.

A status conference was held on June 23, 2015, to consider the court's completion of the adversary proceeding by a different judge than the judge who heard testimony at trial.    The court directed the parties to file statements of their positions pursuant to Fed.R.Bankr.P. 9028 and Fed.R.Civ.P. 63 and to state whether either of them wished to recall any witness whose testimony they believed to be material and disputed.    AP-ECF No. 113.    Both Hyundai (AP-ECF No. 115) and the defendants (AP-ECF No. 116) filed statements that they did not wish to recall any witnesses for this court to consider.

Upon the filing of this Ruling and Memorandum of Decision, the undersigned will file a certification pursuant to Fed.R.Bankr.P. 9028 and Fed.R.Civ.P. 63 confirming that she has reviewed the entire record, including the transcripts and/or recordings of the evidentiary hearings and exhibits admitted during evidentiary hearings, that she is familiar with the same, and that she has determined the adversary proceeding may be completed without prejudice to the parties.

## III.    Findings of Fact

The court held a one-day trial and heard testimony from four witnesses:  James Lagana, a Certified Public Accountant, Randall Paulikens, an expert in the area of public accounting, tax accounting and forensic accounting, Sung Lee, an account receivable manager for Hyundai, and defendant Nelson Rouette.

### a. **QMSI's Business Relationship with Hyundai**

Hyundai's veil-piercing claim is based on actions taken by the defendants in their capacity as the sole officers, directors, and shareholders of QMSI. *See, Trial Tr.* at 125:9-126:2, AP-ECF No. 101.[5] Hyundai is a Delaware corporation that manufactures and sells computer numeric controlled machine tools ("CNC Machine Tools"). At trial, Rouette described CNC Machine Tools as "machines to cut metal to a very precise dimension" for use in the medical, oil and gas, power generation, and aerospace industries. *Trial Tr.* at 126:20-127:4.

QMSI is a Connecticut corporation owned by the defendants. The defendants, Rouette and Calvo-Rouette, are married and own 49% and 51% of the shares of QMSI, respectively. *Trial Tr.* at 125:9-126:2. At all relevant times, the defendants were the sole officers, directors, and shareholders of QMSI. *Id.;* ECF No. 1, ¶9. According to Rouette, over the course of QMSI's existence, the company employed between 28 to 35 people at a time according to its business needs. *Trial Tr.* at 147:8-14.

Commencing in 2004 through mid-2008, QMSI was an authorized distributor of Hyundai's CNC Machine Tools with exclusive rights to 'represent' Hyundai in the Connecticut market. *Trial Tr.* at 129:1-130:6. According to Rouette, as Hyundai's representative, QMSI was responsible for selling and servicing CNC Machine Tools on Hyundai's behalf:

> We would have a sales engineer target a market or an engine program or medical device and find a manufacturing solution for that, provide a quotation to the customer for that machine tool solution, and the customer then would issue a purchase order occasionally to our company directly, sometimes to the actual machine builder. We would then take the machine into our facility in Enfield, Connecticut, or sometimes ship the machine

---

[5] The transcript of the October 28, 2014 trial appears on the docket in its entirety at AP-ECF 101. Citations to the transcript appear in this Ruling and Memorandum of Decision in the following form: "Trial Tr. at PAGE NUMBER:LINE NUMBER."

directly to the customer. We would then . . . implement our solution onto that machine, whether it was adding probing, tooling, whatever types of cutting solutions, and then get the machine up and running, train the customer, and go through an operations safety training . . . and then offer a warranty for a certain designated amount of time.

**Q:** And the -- what interests did the manufacturer -- did the manufacturer of the machine have in the machine once it was in the hands of the customer?
**A:** They were obligated to provide us with parts, service reimbursement, training reimbursement if it went after a certain amount of hours that we were in there for training, and then the warranty service for the allocated warranty time.

*Trial Tr.* at 147:17-148:16.

According to Rouette, Hyundai compensated QMSI separately for sales and services provided. QMSI was compensated for sales of Hyundai CNC Machine Tools by commission. Typically, Hyundai would sell its CNC Machine Tools to QMSI at a discounted dealer rate. QMSI would sell the CNC Machine Tools to its customers – the end users -- at a marked up rate. *Trial Tr.* at 146:5-21. Once a machine was fully serviced and the end user had paid QMSI, QMSI would pay Hyundai the invoiced amount and keep the difference between its discounted dealer rate and the marked up amount paid by the end user as a commission. *Id.* As part of their distributor arrangement, Rouette testified that Hyundai was obligated to reimburse QMSI for certain services QMSI provided to end users incidental to their purchase of the CNC Machine Tools, *i.e.* shipping costs, rigging costs, customer training, and warranty servicing. These reimbursable services and costs were compensated and accounted for by the parties less directly than sales. According to Rouette, Hyundai would often provide QMSI with a "credit memo" to settle a customer's account instead of actual payment. *Trial Tr.* at 139:7-141:16. These credit memos would be used by QMSI to offset amounts owed to Hyundai on future purchases. *Id.*

7

### b. Disputes Regarding Credit Memos

During the first two years as Hyundai's distributor, QMSI paid for all purchases from Hyundai in full.  According to QMSI's own accounting records, QMSI began carrying a significant payable to Hyundai on its books starting in 2006:

|  | 2004 | 2005 | 2006 | 2007 | 2008 | Total |
|---|---|---|---|---|---|---|
| **QMSI Purchases from Hyundai** | $599,239 | $2,663,725 | $2,193,803 | $1,732,312 | $209,769 | $7,403,848 |
| **QMSI Payments to Hyundai** | $599,239 | $2,663,725 | $1,614,005 | $546,007 | $0 | $5,422,976 |
| **Balance Due** | $0 | $0 | $584,798 | $1,186,305 | $209,769 | $1,980,872 |

Plaintiff's Ex. N at 7; *see also, Trial Tr.* at 55:17-56:13.

According to Rouette, the amount actually owed to Hyundai was never accurately reflected in QMSI's records because credit memos promised by Hyundai could not be accounted for in QuickBooks until QMSI actually received a hard copy of the credit memo from Hyundai.  *Trial. Tr.* at 130:23-131:12.

Rouette testified Hyundai CNC Machine Tools required significantly more service than other lines:

> The average amount of service and training calls for a machine tool sale is six under the warranty period. That's the industry average. Our industry average for the [Hyundai] line was over 45 service calls per machine, not including training, retraining, removals, reinstallation, and teardown of machines that were returned or replaced.
> *Trial Tr.* at 161:6-12.

Rouette indicated that it was QMSI's practice to notify Hyundai of any service calls and respond as they directed: "We would go by what their – the recommendation was, which most of the time was 'Can you please try to repair the machine?'"  *Trial Tr.* at 164:20-22.  Although the credit memos associated with these service calls were not

8

accounted for in QMSI's records, Rouette testified that QMSI would provide an email accounting of the credit memos to their account manager at Hyundai "first, quarterly; then, monthly . . . then, weekly". *Trial Tr.* at 140:3-6. Rouette claimed to have provided records of these emails to Hyundai in prior litigation, but the record in this case is notably lacking. *Trial Tr.* at 219:11-220:17.

Rouette also testified that QMSI had an understanding with Wayne Taylor, the account manager at Hyundai responsible for QMSI, regarding the growing payable: "Wayne always kept, you know, notes via the computer and memos or MEMOS stating that our account was about equal, and that's why we were continuing to do business. They would continue to sell us machines, knowing that there was not a $2 million deficit." *Trial Tr.* at 200:20-201:1.

Despite the understanding with Wayne Taylor, Rouette claimed that QMSI's attempts to actually reconcile its account with Hyundai were met with resistance:

> We had an account manager, Wayne Taylor, that was handling our account, and we did all our business directly through Wayne. And as our company grew and the receivables/payables became an issue, they [Hyundai] started having us speak with their A/R managers.
>
> Their A/R managers -- we would give them the documentation. We'd give them shipping labels, bill of ladings, and so forth for the machines that got returned, email authorizations from Wayne Taylor to send the machines back, and they would review them, let us know that were [sic] going to credit our account.
>
> Either they would deny the credit, or we were then told we have a new account manager, and we would start dealing with a new A/R manager. We'd go through the same exact exercise again on the machines that were being sold, that were sold, that were returned.
>
> Our service department had hundreds of thousands of dollars' worth of bills that we were back and forth negotiating with [Hyundai] with their A/R department that never got resolved.
> *Trial Tr.* at 168:1-20.

QMSI's business was heavily dependent on its relationship with Hyundai.  *Trial Tr.*
at 149:24-150:12.  Rouette claimed over 50% of QMSI's sales were attributable to the
Hyundai CNC Machine Tools line.  *Id.*  Comparatively, sales attributable to QMSI's four
next largest lines comprised approximately 30% of QMSI's total sales.  *Id.*  So, despite
the mounting discrepancies in their accounts, QMSI continued to service Hyundai's CNC
Machine Tools:

> We grew the company and acquired some very high-end lines that would
> really have a great growth pattern, price-wise very expensive compared to
> the [Hyundai] side of it, but gave us opportunity to open doors for new
> opportunities on aerospace engine builds and medical device equipment,
> and the [Hyundai] was -- we felt it was going to be a good vehicle to get us
> in the door for customers to understand that we stand behind our
> equipment, that we'll take care of any issue if there's ever an issue, and that
> they're buying a complete service from my group.
> *Trial Tr.* at 173:6-15.

### c.  Breakdown of Business Relations Between Hyundai and QMSI

According to Rouette, the costs of servicing Hyundai's CNC Machine Tools without
recognition of the pending credit memos had a significant effect on QMSI's business.
QMSI hired additional technicians to service the machines under Hyundai's warranty.
*Trial Tr.* at 169:13-18.  Additionally, QMSI discounted sales to affected customers:

> **Q:** Did the problems with the machines require monetary concessions to be
> given to customers?
> **A:** Yes, we had to offer discounts occasionally.
>
> **Q:**  And how much money was involved in these discounts?
> **A:** It varied by each deal, primarily because most companies that were
> buying [Hyundai] would finance the machine. So they really couldn't pay any
> less than what was agreed to in the initial stage. So we'd either give them
> additional accessories, helped them out on additional discounts on future
> machines. Machines that were paid cash for -- there were some times
> where we would charge a customer -- at the end with an agreed credit
> memo given from [Hyundai], we'd charge them 50 percent of what the
> original purchase order was for.

10

*Trial Tr.* at 173:16-174:6

Rouette testified that the anticipated profit margin on Hyundai sales went from 17.5% to a loss of approximately 25% per sale: "If it cost us $100,000 to buy the machine, we were spending $125[,000] to keep the machine at the customer."  *Trial Tr.* at 170:5-7. The reduced profit margin affected QMSI's ability to retain its sales agents:

> **Q:** Did the problems with the machines result in problems with commissions claimed by QMSI's employees?
> **A:** It did because we paid our sales engineers on adjusted gross margin, and as we were reconciling the [Hyundai] sales and realizing that there was such significant loss, it was very difficult to pay a sales engineer the commission that they originally thought they were going to get from a net price to a sale price.
>
> **Q:** So by adjusted gross, would it be correct to say that you would be paying them no commissions --
> **A:** That's correct.
>
> **Q:** -- if you weren't making any profit? And so would it be correct to say you couldn't hold to that agreement and expect people to continue working for you?
> **A:** That's correct.
> *Trial Tr.* at 174:7-22.

Payment disputes between Hyundai and QMSI continued to escalate.  According to a June 2007 email chain, QMSI began withholding payments due to Hyundai pending resolution of their service claims.  *Trial Tr.* at 197:10-198:9; *see also,* Def.'s Ex. 10; *Trial Tr.* at 191:16-202:11.  Hyundai responded by putting QMSI's account on credit hold until they resumed payments.  *Trial Tr.* at 198:17-199:10; *see also,* Def.'s Ex. 12; *Trial Tr.* at 191:16-202:11.  QMSI and Hyundai recognized that the discrepancies in their accounts were affecting both companies' cash flow, but the issues were never fully resolved.  *Trial*

*Tr.* at 198:17-199:10, 203:7-203:25; *see also,* Def.'s Ex. 12; *Trial Tr.* at 191:16-202:11..

Hyundai stopped doing business with QMSI in June of 2008. *Trial Tr.* at 206:22-208:7.

On June 9, 2008, Hyundai filed a complaint against QMSI in the United States

District Court for the District of New Jersey demanding $2,037,249.02 for breach of

contract and unjust enrichment (the "New Jersey Action"). *See Hyundai-Kia Machine*

*America Corp. v. Quality Machine Solutions*, Inc., 2:08-cv-02838-JLL-CCC (D.N.J. 2009);

AP-ECF No. 1, ¶10; AP-ECF No. 45, ¶10. QMSI's counterclaim in the New Jersey Action

alleged that Hyundai breached various agreements with QMSI and failed to pay money

owed to QMSI in excess of $500,000. On September 29, 2009, the New Jersey District

Court ordered a final Consent Judgment against QMSI in the amount of $1,650,000.00,

with such judgment accruing interest at the judgment rate of interest from August 14,

2009. AP-ECF No. 1, ¶11; AP-ECF No. 45, ¶11.

QMSI ceased operations in 2009. *Trial Tr.* at 149:13-15. According to Hyundai,

to date QMSI has not paid Hyundai the amount due under the Consent Judgment. AP-

ECF No. 1 at ¶ 15.

### d. The Connecticut District Court Litigation and its Impact on the Facts in the Current Adversary Proceeding

On December 22, 2010, Hyundai filed a complaint in the United States District

Court for the District of Connecticut (the "Connecticut District Court Litigation") seeking to

pierce QMSI's corporate veil and hold the Rouettes personally liable for the Consent

Judgment. *See, Hyundai-Wia Mach. Am. Corp. v. Rouette*, Case No. 3:10-CV-2020(JCH)

D.Conn. 2010 (the "CT District Court Case"), Doc. No. 1. Hyundai's district court

complaint alleged that the Rouettes siphoned money out of QMSI by taking excessive

shareholder distributions through their personal use of QMSI's business American

Express case (the "AMEX card").  *Id.* at ¶¶ 13-27.  In connection with the Connecticut

District Court Litigation, Hyundai obtained QMSI's QuickBooks computer file.  Hyundai

retained Withum Smith+Brown, P.C. ("Withum"), a forensic accounting firm, to analyze

QMSI's QuickBooks' file.  The following chart prepared by Withum shows QMSI's income,

the shareholder distributions taken by the Rouettes from QMSI, and the shareholder

equity on a yearly basis:

| | 2005 | 2006 | 2007 | 2008 | Total |
|---|---|---|---|---|---|
| **S-Corp Income** | $113,781 | ($153,432) | $253,860 | ($287,190) | ($72,981) |
| **Shareholder Distributions** | $190,270 | $434,962 | $173,421 | $337,652 | $1,136,305 |
| **Shareholder Equity** | ($23,781) | ($640,543) | ($382,140) | ($1,042,663) | N/A |

Pl.'s Ex. N at 3; *see also, Trial Tr.* at 55:17-56:13.

Hyundai filed a motion for summary judgment on May 2, 2012.  CT District Court

Case, Doc. No. 48.  Pursuant to D.Conn.L.Civ.R. 56(a), the Rouettes submitted a

statement admitting to the following facts:

21.     Thus, despite QMSI having losses of $72,981 from 2005 to 2008, the
Rouettes paid themselves over $1,100,000 as "shareholder distributions."
Defendants paid these shareholder distributions despite QMSI having
negative shareholder equity from 2005 through 2008.
. . .

23.     The records for the corporate AMEX cards showed extensive
charges for personal purchases. Every manner of charges were made: daily
coffees at Starbucks; meals at restaurants such Wendy's, Olive Garden,
and Taco Bell; home good supplies from Home Depot, Lowes, and Bed
Bath & Beyond; vacations to Disney World and Europe; cruises on Holland
America; pet supplies at Petco and the Dog Shop; household goods at
Costco and Walmart; clothing from Victoria's Secret, LL Bean, and
Nordstroms; books from Barnes & Noble; sporting goods from Dicks and
Riverview Tackle & Bait; luxury goods from Coach; songs from iTunes;
liquor from K&H Liquors; and the list goes on-and-on.

24.    Since 2004, [Rouette] has "default[ed]" to using his corporate AMEX card to make purchases of his personal expenses since 2004.

25.    Although [Rouette] had a personal credit card, he would only use the corporate AMEX cards to make personal purchases.
. . .
27.    All payments on QMSI's AMEX card were made through QMSI's operating account; the portion of the AMEX payment attributable to the Rouettes' personal purchases would be recorded as "Subchapter S Distributions" in QuickBooks.

28.    QMSI received full payment from virtually every sale of Hyundai CNC Machines Tools to its customers. The sales were all at a profit to QMSI.

29.    Other than inputting personal charges into QuickBooks, neither QMSI nor Defendants regularly maintained reports or schedules showing the amount of personal charges made on the AMEX cards or how the amount of Subchapter S Distributions were in relationship to QMSI's income or profits.
. . .
31.    Defendants did not account for personal purchases or the amount of shareholder distributions on a regular basis. Defendants reviewed this information only upon receipt of QMSI's tax returns at the end of the tax-reporting year.
. . .
34.    Defendants solely determined how much money to take as shareholder distributions and never consulted [QMSI's Accountant] about an appropriate amount of shareholder distributions to take from QMSI.

35.    [Rouette] made "educated guess[es]" without any "convention" as to when to take distributions and how much to distribute.

CT District Court Case, Doc. ID No. 52, Defs.' L.R. 56(a)(2) St. at 7-11.

Based on the parties' statement of undisputed material facts, Chief District Judge Janet C. Hall denied Hyundai's motion for summary judgment, but held that Hyundai had satisfied certain elements of Connecticut's instrumentality standard for piercing the corporate veil:

The undisputed evidence is that QMSI was undercapitalized between 2004 and 2008, when the Rouettes received $1,136,305 in total distributions while QMSI was operating at a loss of $72,981, over those years. Funds were taken out of the corporation for personal rather than corporate purposes: the Rouettes used corporate funds for personal

14

purposes, including for dinners, home goods, cruises, pet supplies, clothing, books, sporting goods, luxury goods, iTunes purchases, and liquor. The Rouettes did not account for these personal purchases or the amount of shareholder distributions they received on a regular basis. The Rouettes made "educated guesses" as to how much money to take as shareholder distributions without consulting their CPA Mr. Laguna, suggesting an absence of corporate formalities. Although the Rouettes introduced evidence that they employed a bookkeeper and CPA, their mere employment does not diminish the fact that the Rouettes determined their distributions without consulting either. These facts—that the Rouettes took money from QMSI at a time when the corporation was not showing a profit and that the payments were not authorized under a resolution of the board of directors—support a finding, as a matter of law, that the Rouettes operated QMSI with a "complete disregard of 'corporate formalities' . . . only for the financial advantage" of the Rouettes.

The second prong of the instrumentality test asks whether the Rouettes exercised control over QMSI in order to perpetrate a fraud or wrong against Hyundai. *See Naples v. Keystone Bldg. and Development Corp.*, 295 Conn. 214, 236 (2010) (stating that the second element of the instrumentality test is that the defendant "used that control 'to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty"). This prong requires Hyundai to prove two things: (1) the Rouettes exercised control over the specific transaction that caused Hyundai harm, *see Tomasso*, 187 Conn. at 558 (stating that the defendant must have exercised dominance or influence over the specific transaction attacked), and (2) the Rouettes exercised such control to perpetrate a fraud or wrong against Hyundai.

As to the first aspect of the second prong, the court does not believe there is an issue of material fact. The evidence clearly shows that the Rouettes exercised control over the "specific transaction" that wronged Hyundai, *see Tomasso*, 187 Conn. at 558, as it was the Rouette's distribution of corporate funds for personal use while QMSI was operating at a loss that Hyundai is attacking. However, as to whether the Rouettes exercised such control to perpetrate a wrong against Hyundai, the court concludes there is a genuine issue of material fact which makes summary judgment improper.

CT District Court Case, Doc. No. 62 at 12-13, 2013 WL 395474, at *6 (D.Conn. Jan. 31, 2013)(*some citations omitted*).

The District Court entered the order denying Hyundai's motion for summary judgment on January 31, 2013.  On February 8, 2013, the Rouettes filed for chapter 7 bankruptcy relief, staying the Connecticut District Court Litigation from proceeding.  On May 13, 2013, Hyundai initiated this adversary proceeding, alleging the same basis for

15

piercing QMSI's corporate veil as formed the basis of the Connecticut District Court Litigation.  AP-ECF No. 1.

The District Court's decision denying summary judgment is not a final judgment on the merits for collateral estoppel purposes.  *Kay–R Elec. Corp. v. Stone & Webster Constr. Co.,* 23 F.3d 55, 59 (2nd Cir. 1994) (holding that denial of summary judgment has no preclusive effect for purposes of collateral estoppel because it is not a final judgment on the issue in dispute and cannot be appealed); *see also, Faraday v. Blanchette*, 596 F. Supp. 2d 508, 516 (D.Conn. 2009); Pl.'s Post-Trial Memo at 13, AP-ECF No. 106. However, the District Court's "finding, as a matter of law, that the Rouettes operated QMSI with a 'complete disregard of corporate formalities . . . only for the financial advantage' of the Rouettes," in satisfaction of the "control" prong of Connecticut's instrumentality veil piercing rule, is consistent with the evidence presented at trial; thus, her determination is entitled to deference as the law of the case.  *See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt International B.V. v. Schreiber*, 407 F.3d 34, 44 (2nd Cir. 2005) ("[O]ur law of the case doctrine 'ordinarily forecloses relitigation of issues expressly or impliedly decided by the appellate court.'") (*quoting Field v. United States,* 381 F.3d 109, 114 (2nd Cir. 2004).

The stipulated facts upon which the District Court based its decision were judicial admissions binding on the parties in the context of the Connecticut District Court Litigation.   "Facts admitted by a party are judicial admissions that bind that party throughout the litigation."  *Hoodho v. Holder,* 558 F.3d 184, 191 (2nd Cir. 2009); 2 McCormick on Evid. § 254 (7th ed.) ("Judicial admissions are not evidence at all. Rather, they are formal concessions in the pleadings in the case or stipulations by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with

the need for proof of the fact."). However, in the context of this adversary proceeding after a full evidentiary trial, the Rouettes' stipulations in the Connecticut District Court Litigation are ordinary evidentiary admissions under Fed.R.Evid. 801 and, accordingly, may be controverted or explained. *See Connecticut Attorneys Title Ins. Co. v. Budnick (In re Budnick)*, 469 B.R. 158, 170 (Bankr.D.Conn. 2012) ("Unless the elements of estoppel are present, in the later action the judicial admission in the earlier action is treated as an evidentiary admission."); *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 96 (S.D.N.Y. 2004) ("[W]hile research discloses no Second Circuit authority on point, the general rule seems to be that a judicial admission only binds the party that makes it in the action in which it is made, not 'in separate and subsequent cases.'").

### e. QMSI's Shareholder Distributions to the Defendants

At trial, Rouette offered a more developed explanation of the Rouettes' personal use of QMSI's corporate American Express (or AMEX) credit card, the methods employed to keep business and personal expenses separate, and the propriety of QMSI's shareholder distributions.

Rouette admitted that both defendants would use the AMEX Card for their personal expenses and then pay for these expenses out of QMSI's operating account. *Trial Tr.* at 136:23-137:25. However, contrary to the stipulations submitted in the Connecticut District Court Litigation, Rouette denied using the AMEX Card exclusively or "by default" to pay for personal expenses. *Trial Tr.* at 212; *cf.* CT District Court Case, Doc. ID No. 52, Defs.' L.R. 56(a)(2) St. at ¶¶ 24 and 25. Although there was no written policy for determining when a shareholder distribution was appropriate, *see Trial Tr.* at 134:9-135:1, Rouette

17

testified that there was a business purpose to justify the extensive use of the AMEX card

for personal expenses:

> **Q:** Was there a convention as to when you used it and when you used --
> when you used the corporate card and when you didn't?
> **A:** We tried to use the corporate card to gain miles for my travel back and
> forth to Korea [on business related to Hyundai]. So if there was a large
> purchase or a purchase, we would usually try to use the American Express
> card and then itemize it out at the end of the month.

*Trial Tr.* at 138:18-25. In addition to the Rouettes, multiple QMSI employees were

authorized to make purchases using the AMEX Card: "Five service engineers, five to eight

sales engineers at different times, office manager, two inside parts managers -- or one

manager, one co-manager -- and that was all."  *Trial Tr.* at 155:3-10.  Rouette testified

that QMSI used the monthly AMEX reports to keep track of the business expenses of the

cardholders:

> **Q:** Did -- now you testified that QMSI utilized an American Express account;
> is that correct?
> **A:** That is correct.
>
> **Q:** And the use of that account in the business was substantial, wasn't it?
> **A:** Yes, it was.
>
> **Q:** What were the reasons for that?
> **A:** American Express had a very good reporting structure monthly, and we
> were very, very -- I don't want to say determined, but we used -- used
> specific processes to make sure we were reporting correctly what expenses
> were for the company, who made those purchases, what was purchased,
> and so forth, and American Express was extremely accurate.

*Trial Tr.* at 152:3-15.  Rouette testified that QMSI's bookkeeper, Leann Dougherty, would

use the monthly reports generated by American Express to account for all QMSI AMEX

charges in Quickbooks:

> Our monthly statement would come in from American Express. We would
> get it online and a hard copy. And Leann Dougherty would pull out the
> American Express card statement. She would go onto QuickBooks, and
> she'd itemize each and every transaction and basically interview each

18

individual's [sic]-- cardholder and note what was spent; you know, if it could get allocated to a customer; what type of business expense it was. If it was equipment that was purchased or if it was paying off a machine tool or buying an accessory, we could note the QuickBooks that way and then provide that information for tax purposes at the end of the year.

*Trial Tr.* at 154:7-18.  According to Rouette, Leann Dougherty also used the AMEX Card's

monthly reports to separate charges attributable to the Rouette's personal expenses from

the general business expenses of QMSI:

American Express would give us a detailed report on each card member on what was -- what was bought right down to the name of the store and phone number and so forth. And it was -- it wasn't a revolving credit. It had to be paid each month.

**Q:** Okay. And what were your processes to take advantage of that feature?
**A:** So we would get the American Express bill. We would take the charges, and Leann, our bookkeeper, would enter them in the QuickBooks, being able to itemize each transaction, note if it was a personal expense or if it was a business expense, and then it would be added into the account.
On the QuickBooks, we would get a report, and you know, quarterly we would know what was spent on American Express, which was -- again, the American Express vehicle was the miles that would accrue to help me fly back and forth to Asia every three months.

*Trial Tr.* at 152:3-153:16.

According to Rouette, Leann Dougherty's bookkeeping practices kept the

Rouettes' personal expenses separate from business expenses:

**Q:** Were your personal expenses accounted for separately from QMSI's business expenses?
**A:** Always.

**Q:** Did you ever take a trip or did your wife ever take a trip and charge it to a business expense on the QMSI American Express account?
**A:** Yes, for both personal and business.

**Q:** Can you explain.
**A**: So if we were to use a -- if I was to buy a flight to go to the power generation show in Orlando, Florida -- I go to that every six months -- we would put that on the American Express card. And if there was a participant that wasn't making it as a business transaction, it could be personal. If it was business, it would be itemized as business. So if it was a flight for $500

19

for each person and one person went not for business, it was $500 for personal and $500 for business.

*Trial Tr.* at 155:22-156:14.

Personal purchases on the AMEX Card were itemized monthly and categorized as "Subchapter S Distributions" in QMSI's Quickbooks accounting. *See Trial Tr.* at 152:3-153:16.; Ex. 4 of Pl.'s Ex. N; *see also, Trial Tr.* at 55:17-56:13. The Rouettes treated the shareholder distributions as income taxable to themselves and reported the "Subchapter S Distributions" on both QMSI's corporate tax returns as well as their personal tax returns. *Trial Tr.* at 159:21-160:19; 40:1-41:12; Pl.'s Exs. Q, U, and V. Contrary to the characterization presented in Hyundai's Post-Trial Brief, *see* Pl.'s Post-Trial Memo, AP-ECF No. 106 at 7, James Lagana, Certified Public Accountant to both QMSI and the Rouettes, testified that he advised the Rouettes of the tax consequences of taking shareholder distributions in excess of retained earnings:

> **Q:** Did you ever discuss the amount of shareholder distributions that the Rouettes should be taking with them?
> **A:** Yes. I noticed that the shareholder distributions were a pretty good-sized amount. So I –
>
> **Q:** What do you mean by that, sir?
> **A:** They were, at times, in excess of the current year's profit.
>
> **Q:** But why did you -- why did you mention that to them?
> **A:** Because I was concerned and because, if the distributions are in excess of their profits, their basis, they become capital gain items on their individual tax returns.
>
> **Q:** What was their response, if any, sir?
> **A:** I don't -- I don't remember the response. I was just letting them know the process.
>
> *Trial Tr.* at 32:7-22.

Despite QMSI reporting negative income in 2006 and 2008, Rouette testified to his belief that the shareholder distributions taken from QMSI through the personal use of the AMEX Card would not leave QMSI undercapitalized:

> **Q:** Did you believe that the amount of shareholder distributions you were taking between 2004 and 2008 when QMS was losing money was appropriate?
> **A:** Yes.
>
> **Q:** Why did you believe that taking that amount of shareholder distribution was appropriate?
> **A:** We were running a business with the majority of our sales being from [Hyundai] and with [Hyundai's] promises of reimbursing us for the expenses, reimbursing us for the service calls, reimbursing us for the training, reimbursing us for the rigging costs of returning machines, reimbursing us for the shipping costs of returned machines, reimbursing us for the time we spent to repair the machines that came in with problems.
>
> **Q:** I don't quite understand that question – that answer. So you're saying that you thought that the -- that taking of distribution was okay because you expected money from Hyundai; is that right?
> **A:** We were told from Hyundai that we were getting our account credited.
>
> **Q:** Okay. Were you expecting money to come then from Hyundai?
> **A:** We were expecting money or credit to come from Hyundai.
>
> *Trial Tr.* at 139:1-139:25.

Despite the escalating credit memo dispute with Hyundai, Rouette continued to take shareholder distributions through 2008 based on an overly optimistic hope for resolution of normal business with Hyundai:

> **Q:** Did you have any awareness that the extent of the shareholder distributions was something that was not okay?
> **A:** I didn't -- I was not aware of that.
>
> **Q:** Did you have any basis for thinking it was okay?
> **A:** I had basis to think that, once the [Hyundai] balanced out, any shareholder -- any draw that was taken out and so forth would be -- certainly made full sense.
>     Sorry. It was okay.
>
> *Trial Tr.* at 183:13-22.

21

After losing the Hyundai account in early 2008, QMSI struggled to continue its business

in a rapidly declining economy:

> The machine tool industry -- the manufacturing industry, you know, the
> valley went to its -- went to a steep decline during the election year, and by
> November of 2008, the manufacturing industry took a -- took a hit that was
> arguably one of the worse hits ever.
> And there was very, very few manufacturing companies in business, able
> to get money to expand their business and grow, and their manufacturing
> demand was – was a fraction of a percent the following years.

> *Trial Tr.* at 183:4-12.

According to Rouette, the Consent Judgment entered against QMSI in the District

Court of New Jersey was the end of the business for QMSI: "QMS being -- this is the end

of QMS. I mean, they're going to do a judgment against you. You're never going to get

your money out of them. The money they owe you you're never going to get. Write it off.

Move on." *Trial Tr.* at 208:1-4.

## IV.    Governing Law and Burden of Proof

Whether Hyundai's claim that the facts of this case justify the piercing of QMSI's

corporate veil to hold the Rouettes personally liable for the Consent Judgment is the

central issue to be determined.   A decision piercing QMSI's corporate veil would

necessarily involve a finding that the Rouettes perpetrated the kind of fraudulent

wrongdoing that would satisfy at least one of the requirements for nondischargeability

under 11 U.S.C. § 523(a)(2), (4) or (6). *See Naples*, 295 Conn. at 234-38. Similarly, a

determination that QMSI's corporate veil should not be pierced would necessarily

determine that the Rouettes are not personally liable for the Consent Judgment, and that

Hyundai does not have a claim against the debtors here that could be deemed

nondischargeable. *See In re Carrano*, 530 B.R. at 557; *Ng v. Adler (In re Adler)*, 467 B.R.

279, 285 (Bankr. E.D.N.Y. 2012).

22

QMSI is a Connecticut corporation, so Connecticut state law determines when to pierce the corporate veil.  "In the absence of an overriding federal interest or policy, federal courts look to the law of the state of incorporation to determine whether to pierce a corporation's veil." *In re Carterhouse, Inc.*, 94 B.R. 271, 276 (Bankr.D.Conn. 1988). "[I]t is the party seeking to pierce the corporate veil that bears the burden of proof." *Old Farms Associates v. Comm'r of Revenue Servs.*, 279 Conn. 465, 489 (2006).

Connecticut law recognizes two theories under which a corporate veil may be pierced: the Instrumentality Rule and the Identity Rule.  The requirements of both rules need not be proven to pierce the corporate veil.  "A court may properly disregard a corporate entity if the elements of either the instrumentality rule or identity rule are satisfied." *In re Carrano*, 530 B.R. at 556 (quoting *Litchfield Asset Mgmt. Corp. v. Howell*, 70 Conn. App. 133, 148 n.11 (2002)).  Although Connecticut law organizes the veil-piercing inquiry under the Identity and Instrumentality Rules, the remedy itself is equitable in nature and, "[n]o hard and fast rule, . . . as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case." *Angelo Tomasso, Inc. v. Armor Construction & Paving, Inc,* 187 Conn. 544, 555–56 (1982) (citations and internal quotation marks omitted.).

Connecticut courts are reluctant to pierce a corporation's veil, and apply the remedy only in "exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." *Id.* at 557 (internal quotation marks omitted).  As the Connecticut Supreme Court most recently noted in *Naples v. Keystone Bldg. & Dev. Corp.*,

[t]he improper use of the corporate form is the key to the inquiry, as "[i]t is true that courts will disregard legal fictions, including that of a separate corporate entity, when they are used for fraudulent or illegal purposes. Unless something of the kind is proven, however, to do so is to act in opposition to the public policy of the state as expressed in legislation concerning the formation and regulation of corporations."
295 Conn. 214, 233-34 (2010) (quoting *Tomasso*, 187 Conn. at 559).

Indeed, Connecticut courts "decline to pierce the veil of even the closest corporations in the absence of proof that failure to do so will perpetrate a fraud or other injustice." *Naples*, 295 Conn. at 234.

## V.    Discussion

To begin, the undersigned notes that as mentioned earlier, she was not the presiding judge at the time of the trial. After review of the docket in this case, review of the audio files from the trial, the argument of counsel, post-trial memoranda, the exhibits, and the typed transcript from the trial, the court concludes that the fact witnesses were credible and that both parties were represented by experienced counsel during the trial.

### A.    The Instrumentality Rule

In order to pierce the corporate veil under Connecticut's Instrumentality Rule, Hyundai must establish three elements by a preponderance of the evidence: 1) that the Rouettes controlled QMSI, with respect to the transaction attacked, so that QMSI had no separate mind, will or existence of its own; 2) that the Rouettes used this control to commit a fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of Hyundai's legal rights; and 3) that the control and wrong-doing of the Rouettes proximately caused Hyundai's injury. *See Naples*, 295 Conn. at 232.

24

The court notes that Hyundai's complaint, AP-ECF No. 1, characterizes its veil-piercing claim as having been brought under the Identity Rule only, not the Instrumentality Rule.  However, no prejudice to the Rouettes would result from the court construing Hyundai's post-trial brief (AP-ECF No. 106) as a motion to amend the pleading to conform to issues actually tried pursuant to Fed.R.Civ.P. 15(b) for the following reasons:

1)   Veil-piercing is not an independent cause of action under Connecticut law; it is an equitable theory of liability used to enforce a judgment against a party not primarily liable.  *Everspeed Enterprises Ltd. v. Skaarup Ship. Int'l.*, 754 F. Supp. 2d 395, 403 (D.Conn. 2010).

2)   The complaint plead sufficient facts to satisfy the elements of the Instrumentality Rule: a) control (AP-ECF No. 1 ¶ 38)("At all relevant times, Rouette and Calvo-Rouette were the sole officers, directors, and stockholders of QMSI and had complete dominion and control of the finances, policies, and business practices of that corporation such that QMSI never had or ceased to have any separate mind, will, or existence of its own."); b) used to commit fraud or other wrong-doing (AP-ECF No. 1, ¶¶ 42)("Rouette and Calvo-Rouette caused QMSI to incur a debt to Plaintiff by consenting to the entry of judgment while knowingly impeding the ability of QMSI to satisfy the judgment by siphoning QMSI's assets for their personal use."); and c) proximate causation (AP-ECF No. 1, ¶ 43) ("Rouette and Calvo-Rouette directly caused QMSI to incur this debt with knowledge that it would not be able to satisfy its legal obligation.").

3)   The Rouettes had a fair opportunity to defend against Hyundai's assertion of liability under the Instrumentality Rule by objecting to the introduction of evidence pertinent to the Instrumentality Rule at trial and by responding to

25

Hyundai's Post-Trial Brief. The court notes that there is a significant, if not complete, evidentiary overlap between the Identity Rule and the Instrumentality Rule, so that the Rouettes likely would have proceeded no differently had the Instrumentality Rule been explicitly included in Hyundai's complaint.

### i. Control Over QMSI

Although the Rouettes were at all times the sole directors, officers, and shareholders of QMSI, their influential positions within the closely-held company do not necessarily compel the conclusion that they exercised control under the Instrumentality Rule. *See, Tomasso*,187 Conn. at 556. Connecticut courts consider multiple factors to determine whether a corporation was so controlled or dominated by the individual sought to be held liable for the corporation's actions that the corporate form should be disregarded, including, as relevant here: (1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; and (6) the amount of business discretion by the allegedly dominated corporation.[6] *Naples*, 295 Conn. at 233 (quoting *Litchfield,* 70 Conn. App. at 152–53)).

Here, the evidence presented at trial established that Rouette alone, not Calvo-Rouette, exercised complete domination over QMSI. Rouette alone was responsible for QMSI's finances, policies, and business practices. Further, it is undisputed that QMSI

---

[6] The court also considered other factors, including: (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own. However, the court finds that these factors are either not relevant as they relate to multiple corporate entities rather than a closely held corporation, or that they do not materially change the overall analysis.

was inadequately capitalized from 2004 to 2008.  During that period, the Rouettes used

QMSI's AMEX Card for personal expenses, taking $1,136,305 as shareholder

distributions when QMSI operated with an aggregate loss of $72,981.  Trial Tr. 74:23 –

75:4.  Distributions were taken at the discretion of the Rouettes, based solely on Rouette's

"educated guesses" regarding their propriety, without reference to an established

corporate policy, and without authorization under a resolution of the Board of Directors.

Although the evidence also established that QMSI followed many corporate formalities,

such as filing corporate tax returns, maintaining separate financial records, and filing

required corporate documents with the Secretary of the State, these facts are insufficient

to mitigate the finding that Rouette exercised control over all other aspects of QMSI.

### ii.  <u>Used to Commit a Wrong</u>

The second prong of the instrumentality test asks whether the Rouettes exercised

control over QMSI in order to perpetrate a fraud or wrong against Hyundai.  *See Naples*,

295 Conn. at 236.  As the District Court noted in its Order Denying Summary Judgment:

> This prong requires Hyundai to prove two things: (1) the Rouettes exercised
> control over the specific transaction that caused Hyundai harm, *see*
> *Tomasso,* 187 Conn. at 558, 447 A.2d 406 (stating that the defendant must
> have exercised dominance or influence over the specific transaction
> attacked), and (2) the Rouettes exercised such control to perpetrate a fraud
> or wrong against Hyundai.
> CT District Court Case, 2013 WL 395474, at *6 (D.Conn. Jan. 31, 2013).

Here, the "specific transaction" attacked by Hyundai for purposes of piercing

the corporate veil consists of Rouette and Calvo-Rouette causing QMSI to enter

into the Consent Judgment "while knowingly impeding the ability of QMSI to satisfy

the judgment by siphoning QMSI's assets for their personal use."  AP-ECF No. 1,

¶ 42.  Although Hyundai's complaint identifies the Rouettes' post-Consent

Judgment conduct as the wrong-doing which caused Hyundai's inability to collect

the 2009 Consent Judgment, the evidence presented at trial focused on the Rouettes improper shareholder distributions from 2006 to 2008.  *See Davenport v. Quinn*, 53 Conn. App. 282, 302 (Conn. App. 1999) (stating that the evidence supported a finding that the second prong of the instrumentality test was met because the corporation had notice of the lawsuit brought by the plaintiff and the defendant continued his practice of commingling funds and removing assets).  The evidence presented at trial clearly establishes that Rouette did exercise control over these specific transactions during the period from 2006 through 2008.

However, the evidence presented by Hyundai is insufficient to establish the Rouettes used their control of QMSI "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights"  *Naples*, 295 Conn. at 236.

First, Hyundai presented no evidence that QMSI did not serve a legitimate business purpose.  *See, Breen v. Judge,* 4 A.3d 326, 332 (2010).  The evidence at trial established that QMSI was a closely-held corporation engaged in the business of selling and servicing CNC Machine Tools from 2005 to 2009.  Although ultimately unsuccessful, QMSI averaged over six million dollars in sales for the fiscal years 2005 through 2008.  *See* Ex. 6 to Pl's Ex. N; *see also, Trial Tr.* at 55:17-56:13.  Moreover, QMSI employed between 28 and 35 people during the course of its operation.  This is not the profile of a corporation established as "a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice."  *Commr. of Envtl. Protec. v. State Five Indus. Park, Inc.*, 37 A.3d 724, 732 (Conn. 2012) (quoting *Tomasso*, 187 Conn. at 557).

28

Second, Hyundai failed to establish that QMSI's dispute with Hyundai regarding the amount due on promised credit memos was fraudulent or intended to wrong Hyundai. Rather, the evidence established that the debt grew over the course of more than two years, from 2006 to 2008, and that Hyundai continued doing business with QMSI despite the growing debt. The evidence at trial established that both Hyundai and QMSI were responsible for the accumulation of QMSI's outstanding debt. Rouette testified that a succession of increasingly uninformed A/R managers at Hyundai contributed to QMSI's growing debt by failing to adequately communicate a resolution of the dispute before it became unmanageable for both QMSI and Hyundai. This testimony was bolstered by that of Hyundai's own witness, Sung Lee, an A/R manager with six (6) months of experience at Hyundai and no personal knowledge of the dispute between Hyundai and QMSI. *See Trial Tr*. 110:16-121:7.

Further, the actual amount Hyundai owed on the credit memos supports the conclusion that credit memo issues between QMSI and Hyundai were *bona fide* disputes. Hyundai's lawsuit against QMSI demanded $2,037,249.02 for breach of contract and unjust enrichment. QMSI's counter-claim alleged that Hyundai had breached various agreements and had failed to pay QMSI over $500,000.00. The Consent Judgment established QMSI's debt to Hyundai at $1,650,000.00. The District Court inferred from these amounts that the Consent Judgment liquidated the disputed amount related to the credit memos at $387,249.02. This amount is significant because it lends credibility to Rouette's testimony that he believed the shareholder distributions would be properly taken if the amounts owed by Hyundai were taken into account. *See Trial Tr*. at 139:1-139:25. Had the $387,249.02 owed on the credit memos been paid by Hyundai, QMSI would have operated at a net gain of $314,268.02 during the period from 2005 to 2008

based on Hyundai's evidence at trial. *See* Pl.'s Ex. N at 3; *see also, Trial Tr.* at 55:17-56:13.

Third, Hyundai failed to establish the Rouettes' shareholder distributions were taken in violation of a legal duty to Hyundai or in contravention of Hyundai's legal rights, beyond a mere breach of contract. "[C]orporate veils exist for a reason and should be pierced only reluctantly and cautiously. The law permits the incorporation of businesses for the very purpose of isolating liabilities among separate entities." *State Five*, 37 A.3d at 732 (quoting *Cascade Energy & Metals Corp. v. Banks,* 896 F.2d 1557,1576 (10th Cir. 1990)). As Judge Dabrowski previously held in his Order on Debtor-Defendants' Motion to Dismiss, even assuming that QMSI was insolvent when the Rouettes took their shareholder distributions, the Rouettes did not have a fiduciary duty to maximize the recovery of Hyundai as the major creditor of QMSI. *See Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 739 F. Supp. 2d 100 (D. Conn. 2010); *Metcoff v. Lebovics*, 51 Conn. Supp. 68, 74 (2007).

Further, at the earliest, any duty the Rouettes owed Hyundai to refrain from taking shareholder distributions would have arisen when notice of the New Jersey Action was served on QMSI, around June 9, 2008. *See Wells Fargo Bank, N.A. v. Konover*, No. 3:05-CV-1924 CFD, 2011 WL 1225986, at *6-7 (D.Conn. Mar. 28, 2011) *on reconsideration in part*, No. 3:05-CV-1924 CFD, 2011 WL 4396509 (D.Conn. Sept. 21, 2011).

### iii.  Proximate Causation

Finally, Hyundai failed to establish that the Rouettes' improper shareholder distributions proximately caused QMSI's failure to make any payments of the Consent Judgment. The proximate causation requirement was examined by the Connecticut

Supreme Court in *Commissioner of Environmental Protection et al. v. State Five Industrial Park Inc., et al.,* wherein the Supreme Court held that there was insufficient evidence to support a finding that a corporation owner's diversion of corporate assets was the proximate cause of the corporation's failure to pay a judgment in excess of $4 million dollars. *Commissioner of Environmental Protection et al. v. State Five Industrial Park Inc., et al.,* 304 Conn. 128 (2012). While there was evidence that the owner diverted approximately $342,000, the Supreme Court found that as ten percent of the total judgment, the diversion of funds "could not be the proximate cause of the plaintiff's failure to collect a judgment." *Id.* at 148 n. 18.

In the present case, Hyundai presented no specific evidence of the amount of improper shareholder distributions taken by the Rouettes after QMSI received notice of the New Jersey Action, on or after June 9, 2008. The only evidence presented regarding this time period established that the Rouettes took $337,652.00 in shareholder distributions during the year of 2008. Assuming that these distributions were taken consistently throughout the year, the total amount of distributions which could be said to have been taken to avoid payment of the Consent Judgment equals approximately $193,340.46, or 11.7% of the Consent Judgment. In light of the Connecticut Supreme Court's decision in *State Five*, the court finds that any damage caused by the Rouettes' improper shareholder distributions after the notice of the New Jersey Action to QMSI could not be the proximate cause of Hyundai's failure to collect on the Consent Judgment against QMSI.

Moreover, Hyundai presented no evidence to contradict Rouette's testimony that QMSI's failure to satisfy the Consent Judgment was caused by QMSI's cessation of

business in mid-2009 due in part to the economic recession's drastic effect on its customers in the manufacturing sector.

### B.   The Identity Rule

In order to pierce the corporate veil of QMSI under the Identity Rule, Hyundai would have to establish by a preponderance of the evidence that there was such a unity of interest and ownership between the Rouettes and QMSI that the independence of QMSI had in effect ceased or had never begun, and that an adherence to the fiction of a separate identity would serve only to defeat justice and equity by permitting the Rouettes to escape liability for the actions taken by QMSI for their economic benefit.  *See Tomasso*, 187 Conn at 552-54.  "The identity rule primarily applies to prevent injustice in the situation where two corporate entities are, in reality, controlled as one enterprise because of the existence of common owners, officers, directors or shareholders and because of the lack of observance of corporate formalities between the two entities."  *Id.* at  560.  In essence, the Identity Rule is satisfied when a corporation is one "in name only."  *Saphir v. Neustadt*, 171 Conn. 191, 210 (1979).

Here, the evidence produced at trial established that QMSI followed many corporate formalities, such as filing corporate tax returns, maintaining separate financial records, and filing required corporate documents with the Secretary of State.  Although the observance of these formalities was insufficient to negate a finding of "control" under the Instrumentality Rule, their presence indicates that QMSI was a separate corporate entity in more than name only.  Moreover, the evidence produced at trial established that QMSI was a legitimate business with its own customers and employees.  *See Campisano v. Nardi*, 562 A.2d 1, 7 (Conn. 1989).

Simply put, QMSI had its own separate existence as a corporation.  The evidence

to the contrary was insufficient to establish otherwise.  Similar to the outcome under the

Instrumentality Rule, the Identity Rule is not satisfied in the present case insofar as it is

neither unjust nor inequitable to maintain QMSI's corporate veil shielding the Rouettes

from individual liability for the Consent Judgment.

## VI.   <u>Conclusion</u>

The court concludes that while the evidence demonstrates that the Rouette's

corporation, QMSI, was undercapitalized, and that Nelson Rouette exercised complete

control over the corporation, there was insufficient evidence to demonstrate that either

Rouette or Calvo-Rouette exercised control over QMSi for the purpose of perpetrating a

fraud or wrong against Hyundai.  Applying either of the Instrumentality Rule or the Identity

Rule leads to the same conclusion:  the evidence presented at trial was insufficient to

demonstrate that it is unjust or inequitable to maintain the corporate form of QMSI and

shield the debtors/defendants in this case from individual liability.

Because the court declines to pierce the corporate veil of QMSI, and because the

veil-piercing theory is the sole basis on which Hyundai alleges that Rouette or Calvo-

Rouette have individual liability for the Consent Judgment, the court finds that it must

disallow Hyundai's claim in the individual chapter 7 bankruptcy cases of the debtors, POC

5-1.  Finally, because there is no claim by Hyundai against the individual defendants, the

court dismisses the Second, Third and Fourth Counts of the complaint as moot.

After considering the parties' pleadings, memoranda, the relevant documents filed

on the docket in this adversary proceeding, the arguments and testimony made during

the trial, and for the reasons that stated above, it is hereby

ORDERED, that POC 5-1 filed in Case No. 13-20250 is disallowed; and it is further

ORDERED, that judgment consistent with this Ruling and Memorandum of Decision shall enter in favor of the Rouettes on Count One of the Complaint; and it is further

ORDERED, that the Second, Third and Fourth Counts of the Complaint are dismissed as moot.

Dated on January 17, 2017, at New Haven, Connecticut.



Ann M. Nevins
United States Bankruptcy Judge
District of Connecticut